Wilde J.
delivered the opinion of the Court. This is a writ of entry in which the demandants count on the seisin of Royal Tyler, their ancestor, and a disseisin in his lifetime by the tenant. As the tenant claims to hold under a conveyance from Royal Tyler, I shall first consider whether any part of the demanded premises passed by that conveyance. The land conveyed is bounded northwesterly on Ann street, there measuring thirty-one feet six inches, northeasterly on Conduit alley, there measuring fifty feet two inches, southeasterly on Dock square, there measuring twenty-eight feet six inches, and northwesterly on the estate of the late Joseph Tyler, there measuring forty-eight feet. This is a very particular description of the land intended to be conveyed, in respect to which there can be no doubt or uncertainty. The lines are short, and were measured, no doubt, with great exactness ; and therefore a mistake in the side lines of twenty or thirty feet cannot be supposed; and besides, I do not understand that any error appears by reference to the boundaries, at least not so as to affect the present question. The demanded premises at the time of the conveyance, were wholly within the limits of Dock square, and consequently were excluded by the terms of the description. The particular description, therefore, taken by itself is perfectly clear ; the only doubt, if there is any, arises from a sweeping clause which follows, and which it is contended enlarges the extent of the grant. The words are “ or however otherwise the same are bounded, or reputed to be butted and bounded, (being the mansion-house and land thereto belonging improved by the late Royal Tyler esquire at the time of his decease.)” That these general words, if they stood" alone in the deed, would be sufficient to pass the demanded premises as part and parcel of the mansion■nouse estate, cannot I think be controverted ; but the whole description is to be taken together, and is to be so construed that its rarious parts may, if possible, be consistent with each *215 other ; and if this cannot be done, then the p irticular description is to be taken as expressing the intention of the parties, rather than general words or those sweeping clauses which are frequently inserted by the conveyancer, and which are passed over by the parties with little notice.* [1] The first part of the clause is very common in deeds of land, but is rarely of any importance. It is useful only when there is some inaccuracy or deficiency in the particular description ; but in cases like the present where the boundaries are certain, and the measure exactly ascertained, a reference to reputed bounds, or bounds not named, cannot vary the construction of a deed. As to the latter part of the clause, that is not inconsistent with the particular description. The land described was land belonging to the mansion-house ; but it does not follow that all the land so belonging was intended to be conveyed. I admit it would be otherwise, if this clause stood alone ; but taken with the other words of description, the intention of the parties appears sufficiently clear. There is a strong case in Cowper, (too strong perhaps) to show the effect of a sweeping clause in a deed, after a particular description. In that case, (Moore v. Magrath, Cowp. 9,) lands had been conveyed for the purpose of making a family settlement, and two pieces of land were particularly described in the deed, after which description this clause was added, — “ together with all other his lands in Ireland.” The grantor owned other lands in Ireland not described ; but the court held, that as the land sparticularly described were alone mentioned in the preamble as the lands intended to be conveyed, those lands only passed, and that nothing passed by the sweeping clause.[1]
In the present case, however, the general words, giving them a reasonable construction, are not inconsistent with the particular description, which is perfectly clear and definite.
But it has been contended, that the soil and freehold in the *216 public square may pass as appurtenant, or that it will be presumed to be part and parcel of the granted premises, and the opinion of Chancellor Kent, as expressed in his Commentaries, is relied on in support of this position. “The idea,” says Chancellor Kent, “of an intention in a grantor to withhold his interest in a road to the middle of it, after parting with all his right and title to the adjoining land, is never to be pre sumed ; it would require an express declaration to sustain such an inference.” 3 Kent, 349.
This may be substantially correct, especially if the description be loose ; but w'hen the lot conveyed is described by metes and bounds, and they clearly exclude the road, I apprehend it cannot be maintained that any part of the soil and freehold of the road will pass. If by the terms of the description the road is necessarily excluded, it is equivalent to an express declaration that no part of the road is intended to be conveyed ; and it is perfectly clear that the fee in the road cannot pass as appurtenant to the land adjoining. Much, therefore, as we respect the opinion of Chancellor Kent, we cannot agree with him when he adds, that if land is conveyed bounded by a highway, the soil and freehold to the centre of the highway will pass. The law here, and in England, and in New York •and other states, is clearly settled, I apprehend, to the contrary. I am therefore inclined to think, that this remark was intended to be qualified by the previous observations as to presumptions in doubtful descriptions. If not so qualified, the remark is certainly opposed to the current of the authorities.[2] The only case referred to by Chancellor Kent, is the case of Peck v. Smith, 1 Connect. R. 103. In that case some novel principles are advanced, which I shall not stop to discuss. The case was decided by a bare majority, and among the judges who decided it there was a great diversity of opinion as to the grounds of the decision. Some of them held that the public had a fee in every public highway, and that the abutters had a defeasible freehold estate in it. Others were of opinion *217 that the abutters had the fee, the public having omy an easement. No general principle, therefore, as to this point, appears to have been established by that case and the obiter dicta of the judges, conflicting as they are with each other, cannot be considered of much weight; and besides, we consider the law to be well settled in Massachusetts, however doubtful it may be thought to be in Connecticut.[1] It is a well established principle here, that the public does not acquire the fee in the land, by the location of a public way over it, but an easement only. Perley v. Chandler, 6 Mass. R. 454 ; Fairfield v. Williams, 4 Mass. R. 427 ; Tippets v. Walker, ibid. 595; Adams v. Emerson, 6 Pick. 57. And to the same effect are all the English and New York authorities. Goodtitle v. Alker, 1 Burr. 143 ; Com. Big. Chimin, A 2 ; Jackson v. Hathaway, 15 Johns. R. 452.
It is equally well settled, that land cannot pass as appurtenant to land, though a right of way may ; and it follows conclusively, we think, that no part of the demanded premises passed by the conveyance from Tyler to the tenant.
The case therefore depends on the validity of the demand-ants’ title. They rely on an ancient title derived from the town, made in the year 1648, and they set up another title commencing by disseisin. As to the ancient title, it is difficult to ascertain with certainty the extent. and limits of the land granted by the town. I am however inclined to the opinion, that the weight of the evidence as to this part of the case is against the demandants.
But it is not necessary to decide this point, because we are all of opinion that the verdict may be well sustained on the title by disseisin, unless indeed it has been lost or barred by a new disseisin on the part of the town. There is sufficient evidence to warrant the jury in believing that the town had been disseised before the conveyance from Dyer to Tyler in the year 1726, unless the relation between the town and Dyer and those under whom he claimed was such as to disable him or them to set up any title by disseisin. That the wharf had *218 been extended before the conveyance, beyond the limits of the land granted in 1648, if the tenant’s argument is well founded as to the extent of that grant, is apparent from the language of the deed ; for the tenant’s counsel contend, that the land sold with warranty was the whole of the land granted and demised by the town ; and it is a strong circumstance in favor of this position, that the wharf is sold without warranty ; which is a circumstance difficult to explain, if the house and wharf were held by the same title. Another circumstance is, that the quitrent is payable for the house-lot only. If then the wharf was beyond the limits of the lease and grant from the town, the erection of the wharf by Dyer would have been a disseisin of the town, unless it can be maintained that a lessee having a right of way or other easement over the land of the lessor, cannot disseise the lessor. It is quite clear that a lessee cannot, during the continuance of the term, disseise the lessor of the land demised, but the reason is, not because he cannot dispute the lessor’s title, but because by the lease he is entitled to exclusive possession, so that he can do no act which can by possibility amount to a disseisin.[1] The'case is quite different when he has only an easement in land adjoining the land demised ; for having only an easement, if he usurps the dominion over the whole estate and retains the exclusive possession of it against the will of the owner, this is a wrongful act amounting to a disseisin. So a joint tenant or tenant in common, although he has a lawful right to the possession of the land in common, yet if he ousts his co-tenant, it is a disseisin. Suppose a lot of land is leased with a right of way over an adjoining lot, and the lessee, instead of using the way, erects a building on it and occupies it for twenty years with the knowledge of the lessor ; can it be doubted that the lessor would lose his right of entry ? We think it is exceedingly clear, that upon the well established principles of the law of disseisin, such must be the legal effect.
The evidence therefore is sufficient to show a disseisin by *219 Dyer, and his right passed by his deed to William Tyler; ■ and the instruction to the jury on this point was correct.
An objection has been made to the admission of this deed as evidence, which is acknowledged to be new, and which is very clearly without any foundation to support it. A deed duly executed, acknowledged and recorded, is always admissible evidence to prove a grant, whether the grant is a valid grant or not. Its operation is not to be examined before it is introduced, and therefore, if the tenant claimed under Dyer by a subsequent grant, it would be no objection to the introduction of the prior grant in evidence. It would not avail, it is true, if the subsequent deed was first recorded and the grantee had no knowledge, actual or constructive, of the former grant. But the tenant does not claim under Dyer, and it is exceedingly clear that this objection cannot prevail.[1] The evidence of the exclusive possession of the Tylers from 1726 to 1783, when the dock was filled, and indeed several years later, is as full and as satisfactory as could be expected to be produced, after such a lapse of time. Pierce goes back in his recollec-. tion, as early as 1757, when the wharf was in the possession of William Tyler, extending then so far out as to include the land described in the verdict. This wharf was occupied as all other wharves were, and there is sufficient evidence to show that wharfage and dockage were paid to the Tylers. It was also proved, that Royal Tyler, the demandants’ grandfather, repaired the wharf, gravelling it at times, and at one time supplying a new capsill ; so that the uninterrupted possession of the Tyler family for the whole time from 1726 to 1783, seems to have been satisfactorily proved, and there is no proof of claim to this part of the demanded premises on the part of tire town, during the whole period. Now it is clear, I think, that the demandants went much further than was necessary to establish their title by disseisin. It would have been sufficient to have begun with the possession of William Tyler in 1757. Pierce testifies that Tyler was then in possession; and he and his descendants certainly continued *220 in possession, without any interruption or claim hv the town, until 1783. The town then had lost their right of entry, and could not by an actual entry become re-seised of their former estate.
But it is objected, that Dyer, holding under the lease to Bendall, could not disseise the town during the continuance of the lease, and that Tyler, claiming under the grant from Dyer, labored under the same disability. This disability however was removed in 1726, when the lease expired, and cannot be material. From that time until 1783, Tyler and his descendants continued in the open undisputed possession of the premises, claiming title, and such a possession certainly amounted to a disseisin.
Then it was contended, that by the introduction of the quitrent in the deed from Dyer to Tyler, and by the payment of rent in 1774, he and bis heirs were estopped to deny the title of the town. This might be so if the w'harf had been included in the lot charged with the quitrent; but it was not; the house-lot alone was thus charged, and this objection also fails. It is not strengthened by the consideration, that the town had no knowledge of the deed from Dyer to Tyler. They had a right to demand an exhibition of his title ; their ignorance therefore, being the consequence of their own omission, cannot affect the demandants’ legal rights. To constitute a disseisin, it is not necessary that the owner should have actual knowledge of the disseisin ; if the possession of the disseisor is open and adverse, and the owner has the means of knowing the fact, it is sufficient. But the town must have known that the quitrent was not paid on account of the demanded premises, for it was charged on the land granted ; which, according to their construction of the grant, included no part of the land now demanded.
The next question to be considered is, whether the tenant, on his part, can establish a title by disseisin. It is said that the entry of the town in 1783 or 1784, and filling up the dock, amounted to a disseisin of Tyler ; and we are of opinion that it did, if Tyler was then seised of the dock. Whether he was so seised or not, is immaterial, because if he were, the disseisin was only of the part filled up. The town claimed no *221 more at that time ] and it appears by the votes of the town from 1757 to 1783, that there was no dispute with the abutters on the dock as to their title to their wharves, but the abutters claimed title to the dock ; and the committee appointed by the town to examine this claim, thus conclude their report : — “ Upon the whole, the committee having considered the long uninterrupted possession of the abutters and their predecessors, and having looked into a large number of deeds and town records, are of opinion, that the town has but little more than a right in common to that part of the dock meant to be filled up, and that it is most convenient, in the choice of difficulties, to make some composition with the abutters and to make them some offer for a release of their right.”
So in the votes and proceedings of the town, the proprietors of the wharves are described as abutters on the dock, and their titles are not questioned, but impliedly admitted ; and although the use of the wharves was thereby destroyed, that might authorize the owners to maintain an action to recover damages for the injury, but it did not amount to a disseisin.
The subsequent 'proceedings of the selectmen, such as paving the square, were equivocal acts, which were properly submitted to the jury to determine with what intention they were done ; and they decided, we think, correctly. There was no evidence that the selectmen were authorized to assert the right of the town to the wharves; but as they were used as a public square or passage way, together with the dock when filled up, the selectmen were authorized to pave the whole for the public accommodation, and the act itself indicates the intent. The use of a way is not such exclusive possession as can amount to disseisin.
The last objection to the demandants’ claim involves the construction of the deed from John S. Tyler to Royal Tyler. This is not very important, for if well founded, it would only give rise to another action. We think, however, that the objection is not well founded, and that there is a plain distinction between this deed, and the deed from R. Tyler to Seollay. In the deed to Scollay there is a particular description of the land intended to be conveyed ; whereas, in the deed from Tyler to Tyler, the words of description *222 are general. The mansion-house and appurtenances are conveyed, however they may be bounded, or any part thereof, or which at any time had been held and occupied or enjoyed as part or parcel of the same. [1]
March 31st, 1831.
The case was afterwards referred by consent of parties, to assessors, to ascertain the betterments on the land described in the verdict, and the value of the land without the present buildings thereon ; and it was agreed that judgment should be rendered upon their report in the same manner as if the value of the land and of the improvements had been found by the verdict of the jury.
The assessors reported, that the value of the betterments was $.2400 ; that the value of the land at the time of the verdict without any betterments, and considering it to be open southerly on a way or street, or to have a right of passage from the southern boundary thereof to North Market street was $ 3600 ; that considering it not to be so open nor to have such right of passage, the value was $2500 ; and that considering it to be subject to the easements of light, air and passage or way under the deed of Royal Tyler to Scollay, or any other title to such easements, the value was $ 1000. They further reported, that the demandants’ counsel denied their right to inquire into any easements or incumbrances to which the land was liable, and to estimate the value of the land as being subject to such incumbrances ; and also denied their right to estimate the value of the land as not being open southerly on any way or street, or as having no right of passage or way from the southern boundary of the land to North Market street.
Curtis and C. G. Loring cited to the point that the easements belonging to the tenant as owner of the land formerly belonging to Scollay, were not extinguished, 3 Cruise’s Dig. 116, 129 ; Vin. Abr. Extinguishment, C; James v. Morey, 2 Cowen, 246 ; Gibson v. Crehore, 3 Pick. 475 ; Alden v Murdock, 13 Mass. R. 256 ; Winter v. Brockwell, 8 East, 308 : — That the demandants had acquired no right of way to *223 North Market street, Commonwealth v. Newbury, 2 Pick. 51, 60, note; Emerson v. Wiley, 7 Pick. 68; Commonwealth v. Low, 3 Pick. 408.

April 2d.

Sullivan and S. Hubbard insisted that there were only two questions properly before the assessors ; one, what was the value of the land without the improvements ; the other, what was the value of the improvements. St. 1807, c. 75, § 3. The tenant pleaded that the demandants had no title to the land ; and he cannot claim easements, in the same action. He might have pleaded a special non-tenure. Alden v. Murdock, 13 Mass. R. 256.
Further, the easements have been extinguished by unity of possession, and by the erection of the buildings by the tenant. Clap v. M'Neil, 4 Mass. R. 589.
The demandants are entitled to a way from the southward boundary of the land recovered, to North Market street.
Wilde J.
delivered the opinion of the Court. No question has been made as to the value of the buildings and improvements, but the parties disagree as to the value of the premises. Three estimates have been reported by the assessors ; and it is submitted to the Court to determine which of these is most conformable to the legal rights of the parties. It is clear, that the land recovered must be estimated with all its privileges and appurtenances, and subject also to all existing incumbrances. It is admitted that the tenant, as owner of the mansion-house estate, had a right of passage over the premises, and that it still exists, unless it has been forfeited or extinguished ; so that the main question is, whether any thing appears which in law amounts to a forfeiture or extinguishment of this easement. It has been argued, that by the purchase of the tenant from the town, his right of passage merged in the fee ; and such would have been the legal effect, if both rights had been derived from the same title. But the tenant had the fee and the easement by different titles, the one legal and the other defective ; there was, therefore, .no merger.[1] Nor can the tortious entry of the tenant under a defective title, claiming the fee, work a forfeiture of his legal rights, nor is he estopped *224 to assert these rights by his having set up this defective title ™ defence. He had the right to try the validity of that title, without prejudice to his other claims.
It has, however, been objected, that if the tenant’s right of passage did not merge in the fee, it was destroyed by his own act in erecting his buildings. This is true, but it does not affect the principles by which the value of the premises is to be estimated. This estimate was to be made without regard to the buildings and improvements. The assessors were directed to inquire and ascertain what would have been the value of the estate recovered, if no buildings and improvements had been made by the tenant. And this is conformable to the language of the statute.
The demandants set up a claim to a right of passage from the premises to North Market street, as appurtenant to the land recovered, but nothing appeared at the trial which can sustain this claim. The demandants’ title commenced by disseisin and they could not claim a right of way by necessity, and no user was proved sufficient to establish a right. If there was ever a right of passage to the extent claimed, it was appurtenant to the mansion-house estate.
The result is, that the last and lowest estimate reported by the assessors is to be considered as fixing the value of the premises recovered ; and judgment is to be made up in conformity to that estimate.

 See Anon. Lofft, 398.

 See Barnard v. Martin, 5 N Hamp.R. 536; Magoun v. Lapkam, 21 Pick. 135; Allen v. Allen, 2 Shepl. 387; Whiting v. Dewey, 15 Pick. 434; Smith v. Strong, 14 Pick. 128; Stearns v. Rice, 14 Pick. 411; Chaplin v. Srodes 9 7 Watts, 410; Howell v. Saule, 5 Mason, 410; Meyrick v. Meyrick, 2 Crompl. & Jervis, 223; Smith v. Galloway, 5 B. & Adol. 43.

 See Chatham, v. Brainerd, 11 Connect. R. 82; Champlin v. Pendleton, 13 Connect. R. 23.

 See O'Linda v. Lothrop, 21 Pick. 292; Buckman v Buckman, 3 Fairf. 463; Thorndike v. Richards, 1 Shepl. 430; Keith v. Reynolds, 3 Greenl. 393 ; Johnson v. Anderson, 6 Shepl. 76.

 See Sachet v. Wheaton, 17 Pick. 103. So a mortgagee cannot be disseised by the mortgager. Hunt v. Hunt, 14 Pick. 374.

 The registry of a deed is constructive notice only to after-purchaser* under the same grantor. Bates v. Norcross, 14 Pick. 224.

 See Bliss v. Rice, 17 Pick. 36.